UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-20631-GAYLES/OTAZO-REYES

**UNITED STATES OF AMERICA**

vs.

**CARLOS MIGUEL RODRIGUEZ,**

   **Defendant.**

_____/

**GOVERNMENT'S APPEAL OF MAGISTRATE JUDGE'S DECISION DENYING
PRETRIAL DETENTION**

  Carlos Miguel Rodriguez is a key member of a ring of counterfeit check cashers in South Florida and should not be at liberty pending his trial, certainly not on the terms set by the Magistrate Judge.  Two of his similarly situated co-defendants have been detained by different Magistrate Judges, and the result should be the same for Rodriguez.

**Introduction**

  Rodriguez took over bank accounts belonging to his victims by buying their social security numbers on the dark web in exchange for cryptocurrency, and then drew counterfeit checks on those bank accounts made out to people supplied with fake identifications by other members of the counterfeit check ring.  This scheme allowed Rodriguez and his co-conspirators to net as much as $100,000 in cash in a weekend.  Rodriguez, who claims no legitimate income, has two late model Mercedes in his name – one he neglected to disclose to pre-trial services and a second as to which he cannot even explain the source of his payments.

  Given these facts, and the risk of flight and harm to the community he poses, the Government sought pretrial detention.  On October 10, 2019, Magistrate Judge Louis denied the Government's motion, and instead allowed Rodriguez to go free on simply a $25,000 ten percent

bond and a $200,000 personal surety bond backed by his mother and a friend (who have no assets to their names). Such an insignificant amount of money – which puts at risk only $2,500 up front – will not assure that Rodriguez appears at future proceedings or that he ceases his persistent course of criminal conduct. This bond is also inconsistent with the decisions of two other Magistrate Judges (Otazo-Reyes and Reid) who have detained Rodriguez's main co-defendants.

## Background

### A. Rodriguez's Arrest on State Charges in October 2018.

In October 2018, Miami-Dade Police ("MDPD") officers arrested Rodriguez on state charges after they went into the home where he resided with his father, mother, and sister, to investigate allegations of illegal cockfighting. When the officers arrived at Rodriguez's home, they realized it doubled as the headquarters for a second type of illegal activity: counterfeit check cashing. The officers obtained a warrant to seize evidence related to the check cashing operation, which ultimately yielded: two disposable phones (one found a bedroom that the MDPD officers understood to belong to Rodriguez and one found in the Mercedes registered to him), lap top computers, a printer, a stack of counterfeit checks (some that ultimately bore Rodriguez's fingerprint) and iPhones (including one found on Rodriguez's person). State prosecutors

ultimately referred the matter to the United States Attorney's Office for the Southern District of Florida.

### B. Cooperating Witnesses Against Rodriguez

A number of Rodriguez's co-conspirators were convicted, are currently serving lengthy sentences, and are cooperating against him:

- Orlando Chavez:  18-20338-MARTINEZ (201 month sentence)
- Mikel Herrera:  18-20338-MARTINEZ (90 month sentence)
- Jorge Orozco:  19-20201-MARTINEZ (102 month sentence)
- Michael Caro-Silverray:  18-20891-COOKE (202 month sentence)

Mikael Herrera, for example, has explained how he taught Rodriguez and his father to make the counterfeit checks. Orlando Chavez, meanwhile, described how Rodriguez was good at making the counterfeit checks, thanks in part to his proficiency with computers. Chavez provided his iPhone as part of his cooperation with the Government and it contained text messages with Rodriguez (saved in Chavez's phone by Rodriguez's nickname, "Carlitos"). In addition to extensive texting back and forth about how to access dark websites to purchase personally identifying information ("PII"), Chavez and Rodriguez texted about which banks to target and which states were least likely to arrest the check cashers passing the fraudulent checks (a problem they encountered). In addition, Chavez's phone contains a letter that Rodriguez drafted to a bank, pretending to be a customer asking to change the information on the account to a phone number they controlled. Chavez also verified Rodriguez's voice on reordered calls to the banks that capture Rodriguez impersonating the actual customers to change the contact information on the

account; this step was important because it then allowed Rodriguez to authorize the cashing of a fraudulent check if the bank teller called to authorize the transaction.

### C.     Indictment and Charges in this Case

On September 26, 2019, a grand jury in this District returned a 28-count indictment charging Rodriguez with: conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349 (Count 1), substantive bank fraud, in violation of 18 U.S.C. § 1344 (Counts 2-3), aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 4-5) and concealment money laundering, in violation of 18 U.S.C. § 1956 (Count 8). The Indictment also seeks forfeiture of various assets pursuant to 18 U.S.C. § 982, including the home where Rodriguez will reside if released on bond and his family's boat.

When law enforcement arrested Rodriguez on October 2, 2019, they obtained a warrant to search his home for evidence of the counterfeit check scheme. Law enforcement found a letter dated September 23, 2019, in the bedroom they understood to be Rodriguez's based on the prior search in October 2018.[1] The letter was nearly identical to the letter Rodriguez previously texted to Chavez, purporting to be from a customer who wanted to change her contact information on the bank account. All of this evidence demonstrates the strength of the case against Rodriguez.

### D.     Other Facts Relevant to Detention.

#### 1.     Unaccounted-for Cash.

The cooperating witnesses described how quickly this scheme frees up cash, yielding as much as $100,000 in a single weekend. The Government has not seized any of this cash to the date. Although it is difficult to estimate the amount of cash the scheme yielded in total, bank

---

[1] Although the testifying agent at the detention hearing could not recall whether the letter was found in the house or in the room that law enforcement believed to be Rodriguez's room, the Government is prepared to call a different law enforcement agent to establish that fact.

records show that bank accounts controlled by Rodriguez, his family members, and his co-conspirators have received exceeded $1.3 million in cash deposits.

A bank account in the name of Rodriguez's mother received $206,000 between July 2016 and August 2018. Similarly, a bank account in the name of Pages Cleaning Company received cash deposits totaling $354,285.28 during the same time frame. According to a cooperator, Pages Cleaning was not real and instead was used by Rodriguez and his family members to order the business check paper necessary for the scheme. Law enforcement obtained a warrant to search Rodriguez's home, the alleged principal place of business for Pages Cleaning Company, for documents related to any legitimate business activity of the cleaning company and did not find anything. Further, a disposable cell phone found in what law enforcement understood to be Rodriguez's bedroom in the 2018 search contains text messages discussing the deposit of various checks and then a text directing the receipting to deposit cash into the Pages Cleaning Services Bank account. Bank records confirm that the recipient made the cash deposits as instructed. The disposable phone contained multiple outgoing calls to the banks that were targeted in the scheme, consistent with the cooperators explanation that Rodriguez typically called the banks to impersonate the customers and change the account information because he spoke English.

The lifestyle of Rodriguez and his co-conspirators confirm that they have access to a significant amount of cash. His family home was purchased in cash and has a net worth of approximately $244,000. Rodriguez and his family own a boat that was purchased with at least $60,000 in cash. Rodriguez also, as noted above, has two Mercedes under his name; paperwork seized in the family home suggests that the down payment for one of those cars was paid with $14,000 cash. Yet Rodriguez, by his own admission, has **_no_** source of income. According to cooperating witness Chavez, Rodriguez told him after his arrest on state charges in 2018, that he

was going to claim the cash deposits from the counterfeit check scheme were cash that his mother received working as a stripper, and that he had vetted the cover story with the manager of a strip club in Doral, Florida.

### 2. Ties to Cuba.

Rodriguez was born in Cuba, and although he became a naturalized United States citizen in approximately July 2016, according to databases available to law enforcement, his ties overseas remain significant. Rodriguez traveled to Cuba as recently as May 2018, explaining over text message to cooperating witness Chavez that he was visiting his home town. The Pretrial Services Report confirms that Rodriguez indeed still has family in Cuba.

### 3. Use of Fake Identifications.

A key component of the fraud, and its cover up, is the use of fake identifications. The cooperating witnesses explained that members of the counterfeit check ring had a contact who could make fake identifications. These fake identifications were provided to the check cashers, in order to cover up their identity. For example, there is evidence that a check casher with a driver's license in the name of "B.J" attempted to cash a counterfeit check written to her by a company with the initials G.A. in September 2018 in Salt Lake City, Utah. Once the bank teller became suspicious of the check, the woman with the fake identification ran out of the bank, leaving behind the fake check and the fake driver's license. A copy of fake checks from the G.A. account were found later in Rodriguez's home, and he had an iPhone note saved on the iPhone seized on his person in October 2018 that contained the name, social security number, and date of birth of the owner of G.A.

### 4. Continued Criminal Activity.

Despite being arrested on state charges in October 2018, Rodriguez continued with the scheme, as evidenced by the fact that law enforcement found a recently dated letter attempting to compromise yet another bank account during the search of his home after his arrest in this case.

## Procedural History

At Rodriguez's initial appearance, the United States moved for pre-trial detention, arguing that he was a risk for flight because of his ties to Cuba, the wide-ranging and serious nature of the offense, the overwhelming weight of the evidence, the unaccounted for cash available to the Rodriguez, and the fact that he has persisted in the criminal scheme despite his arrest. Presented with similar arguments, Magistrate Judge Otazo-Reyes ordered codefendant Kenny Franchie Alfaro detained pending trial, finding that he posed a risk of non-appearance due to his access to a large amount of cash, his frequent international travel, and the fact that he accessed the identifications of others. Magistrate Judge Reid likewise has ordered codefendant Carlos Miguel Rodriguez, Sr. detained, based on the same factors plus his criminal history. Magistrate Judge Louis, however, declined to detain Rodriguez, and while we appreciate her consideration of the issue, that ruling is mistaken and cannot stand.[2]

## Argument

The Bail Reform Act empowers the Court to detain a defendant pending trial upon a finding that the defendant is a risk of flight or if there is a serious risk that the defendant will obstruct or attempt to obstruct justice. *See* 18 U.S.C. § 3142(f)(2); *see also* 18 U.S.C. § 3142(e)(1) (pretrial detention authorized where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community"); *see*

---

[2] Rodriguez is currently detained pending the outcome of this appeal.

*also United States v. Rodriguez*, 897 F. Supp. 1461, 1463 (S.D. Fla. 1995) ("Proof of both flight risk and danger to the community is unnecessary."). A finding that a defendant represents a danger to the community must be supported by clear and convincing evidence, while a finding of risk of flight need only be supported by a preponderance of the evidence. *See* 18 U.S.C. § 3142(f); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988). Courts also determine whether a defendant presents a risk of obstructing justice by a preponderance of the evidence. *US v. Friedman*, 837 F.2d 48, 49 (2nd Cir. 1988); *US v. Mehanna*, 669 F.Supp. 2d 160 (D. Mass. 2009); *US v. Eaton*, No. 05-100, 2005 WL 1939891, at *2 (S.D. Ind. Aug. 2, 2005); *see also US v. Hagerty*, No. 08-00317, 2009 WL 920617, at *1 (E.D. Ark. Apr. 2, 2009).

In determining whether detention pending trial is appropriate, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). When examining a magistrate judge's pre-trial detention order, a district court must review the case *de novo*. *See United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987). Although the court need not conduct a *de novo* hearing, it must review all the facts presented to the magistrate. *King*, 849 F.2d at 490-91.

Here, the relevant factors and the facts described above support pretrial detention, or at minimum a more serious bond than the lenient one set by the Magistrate Judge.

### A. The Nature and Circumstances of the Offenses Charged

The sophisticated nature of Defendant's charged crimes, his past efforts to conceal the fraudulent scheme, and his exposure to a lengthy term of imprisonment demonstrate that he poses

8

a substantial flight risk. While the Government is working with over ten financial institutions to determine the loss that resulted from Rodriguez's conduct, one bank alone has already estimated the loss to be approximately $1 million as a result of counterfeit checks drawn on bank accounts found on the computer and check paper seized from Rodriguez's room. In addition, Rodriguez faces aggravated identify theft charges with mandatory minimums of two years for each count. Due to his lengthy prison exposure and history of sophisticated deception and concealment, Rodriguez poses a serious flight risk.

### B. The Weight of the Evidence

The charges against Rodriguez are supported by overwhelming evidence. Cooperating witnesses confirm his critical role in the fraudulent scheme, corroborated by, in one case, extensive inculpatory test messages. Other documentary evidence further corroborates the cooperating witnesses, including Rodriguez's travel recordings placing him in Utah and Arizona, where counterfeit checks were cashed. Further, law enforcement seized stack of counterfeit checks from his home with his fingerprints and an iPhone from his person with the social security numbers of the people he victimized and incriminating text messages. The strong evidence of Rodriguez's guilt weighs heavily in favor of pretrial detention.

### C. The Defendant's History and Characteristics

Defendant's access to cash, his extensive travel, his prowess at making fake identification documents, and his persistent criminal conduct make it highly unlikely that any combination of conditions will reasonably assure his presence at future proceedings.

*1. Cash.* Between Pages Cleaning Company and accounts controlled by Rodriguez's mother and family members, Rodriguez has access to a significant amount of cash. He also has the wherewithal and know how to generate cash quickly through the fake check scheme.

*2.*   *Travel Practices.*  Rodriguez's past travel practices, both to Cuba and outside of the Southern District of Florida, indicate that he could successfully flee.

*3.*   *Fake Identifications.*  Rodriguez has proven expert at accessing other people's identities and could certainly do so for himself to avoid trial in this case.

*4.*   *History of Criminal and Fraudulent Conduct.*  Although Rodriguez avoided criminal punishment as a result of the October 2018 state arrest, three years after he joined the counterfeit check ring, he continued to engage in the same fraudulent conduct.  This evidence of ongoing, unrepentant criminal conduct is key.  *See United States v. LeClercq*, No. 07-80050-CR, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (unpublished) (considering finding of the defendant's civil liability for fraud in determining that she posed a flight risk).  Far from halting his illegal activities, Rodriguez carried on, asking a co-conspirator for paper to make counterfeit checks after his stock was seized in the warrant back in October 2018.[3]

### D.   The Nature and Seriousness of Defendant's Danger to the Community

This factor too supports pretrial detention.  The Bail Reform Act directs the Court to consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4).  As the Eleventh Circuit has recognized, "[t]he term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly understood in everyday parlance." *King*, 849 F.2d at 487 n.2.  While "danger to any person" is intended to address physical danger to a particular individual, danger to the community "refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *Id.*  Thus, "the concern about safety [is] given a broader

---

[3] Nor can Defendant claim that strong family ties limit his risk of flight.  Defendant's father and sister face charges for the scheme and his father is now detained pending their trial.

10

construction than merely danger of harm involving physical violence." *Id.*; *see also LeClerq*, 2007 WL 4365601, at *4 & n.5 (unpublished).

Rodriguez poses a substantial economic danger to this community. Rodriguez targeted ordinary people living in the Southern District of Florida and elsewhere. Rodriguez bought their information on the dark web, impersonated them, and exploited their information for his gain. Rodriguez's callous disregard for the people he victimized establishes that he will remain a threat to the community if released. That Rodriguez continued to engage in the same illegal conduct even after being arrested demonstrates that he is not likely to be deterred from future criminal conduct by the pending charges. *See United States v. Burke*, No. 13-20616-CR, 2013 WL 5194138, at *1 (S.D. Fla. Sept. 17, 2013) (finding that where a defendant engaged in "methodical and repetitive efforts to defraud and evade detection," this "pattern of deception suggests that [he] would continue to pose a danger of further harm to the community if released"). Given the strong likelihood that Rodriguez would persist in his pattern of criminal activity to the detriment of the community, Rodriguez's detention is necessary to ensure that he does not continue to use and endanger the personal information of the people of Miami.

In addition to the deception inherent in the fraudulent scheme, Rodriguez also attempted to impede the criminal process, switching cell phone numbers repeatedly, using deposable cell phones that can't be traced to him, and enlisting check cashers who were provided fake identifications to ensure that he did not get caught. Rodriguez even conjured a cover story after he was arrested on state charges, blaming his mother for the illegal cash deposits. The "willingness to obstruct justice evinces a lack of respect for the rule of law and weighs heavily towards a finding that Defendant is a flight risk and a danger to the community." *United States v. Burstyn*, No. 04-CR-60279-ALL, 2005 WL 2297605, at *4 (S.D. Fla. Mar. 18, 2005) (unpublished). Accordingly,

"obstruction of justice, an attack on the rule of law, is a traditional ground for pretrial detention." *Id.*

All of these facts also show why any kind of bond, certainly one as low as that set by the Magistrate Judge, will not suffice.[4] Restrictions on Rodriguez's access to personal identifying information, for example, are meaningless constraints on a defendant who has shown utter disregard for the law and who has demonstrated his ability to use fake identifications to evade detection. Rodriguez's facility for producing and using fake identifications also means that he can easily avoid travel restrictions; Rodriguez can readily disappear to Cuba (where he traveled just recently) or simply hide in this community, avoiding a trial at which the Government would present overwhelming evidence of his guilt, only to reappear later using a fake name and living off fast cash just as he has throughout this scheme. A bond, simply put, does not ensure his appearance at future court proceedings or protect the public. Certainly the bond set by the Magistrate Judge – which puts at risk only a paltry sum in the event of his flight – does not meet the requirements of §3142. Although three co-defendants who played lesser roles in this scheme have received bonds, none of them pose the economic danger, or risk of flight, that Rodriguez does. Rodriguez is most similar to his father and Alfaro, both of whom, as described above, have properly been detained by other judges of this court.

---

[4] Indeed, Magistrate Judge Reid required co-defendant Raul Alpizar Gonzalez to post a more significant bond than Rodriguez, despite the fact that Gonzalez occupied a lower level in this conspiracy as a person who recruited the check cashers. Magistrate Judge Reid required Gonzalez to come up with 10 percent of the amount of cash deposits the Government identified to date as going to Gonzalez (approximately $80,000 based on an unfinished and incomplete review of the bank records). Under Magistrate Judge Reid's approach, Rodriguez should, at a bare minimum, pay 10 percent of the amount of cash deposited into the Pages Cleaning bank account and the account in his mother's name which would total over $50,000.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court detain this Defendant pending trial.

October 15, 2019

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

*/s/ Elizabeth Young*
ELIZABETH YOUNG
Special Assistant United States Attorney
Court ID No. A5501858
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (202) 262-7560
Elizabeth.Young@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on October 15, 2019, I electronically filed and served this document with the Clerk's Office in the Southern District of Florida.

/s/*Elizabeth Young*
Elizabeth Young
Special United States Assistant Attorney